UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X   Case No.:
LARTHA STARKS,

                      Plaintiff,

                                                                                               COMPLAINT

   -against-

MAXIMUS HEALTH SERVICES, INC., JOSHUA      PLAINTIFF DEMANDS
NIELSEN, Individually, and NORA KYLE,             A TRIAL BY JURY
Individually,

                      Defendants.
-------------------------------------------------------------------X

     Plaintiff, LARTHA STARKS, by her attorneys, PHILLIPS & ASSOCIATES, ATTORNEYS AT LAW, PLLC, hereby complains of the Defendants, upon information and belief, as follows:

### Nature of the Case

1. Plaintiff complains pursuant to the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the New York State Human Rights Law ("NYSHRL"), New York State Executive Law § 296, *et seq.* Plaintiff seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated against on the basis of Plaintiff's disabilities (diabetes and polyuria) and retaliated against for complaining of this discrimination, resulting in her unlawful termination.

### Jurisdiction and Venue

2. Jurisdiction of this Court is proper under 42 U.S.C. § 12133 and 28 U.S.C. §§ 1331 and 1343.

3. This Court has supplemental jurisdiction over Plaintiff's claims brought under state law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as the acts complained of occurred therein.

1

## Procedural Prerequisites

5. Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

6. Plaintiff received a Notice of Right to Sue ("Notice") from the EEOC, dated August 7, 2019, with respect to the herein charges of discrimination. A copy of the Notice is annexed hereto.

7. This Action is being commenced within ninety (90) days of receipt of said Notice.

## Parties

8. At all times material hereto, Defendant MAXIMUS HEALTH SERVICES, INC. ("MAXIMUS") was a foreign business corporation operating in the State of New York.

9. At all times material hereto, Defendant MAXIMUS had 15 or more employees.

10. At all times material hereto, Defendant MAXIMUS was Plaintiff's employer under the ADA.

11. At all times material hereto, Defendant MAXIMUS was Plaintiff's employer under the NYLL.

12. At all times material hereto, Defendant JOSHUA NIELSEN ("NIELSEN") was an employee of Defendant MAXIMUS.

13. At all times material hereto, Defendant NIELSEN was Plaintiff's supervisor and had the power to hire, fire, demote, promote, and/or directly affect the terms and conditions of Plaintiff's employment, as well as the power to direct Plaintiff's daily work activities.

14. At all times material hereto, Defendant NIELSEN was Plaintiff's employer under the NYLL.

15. At all times material hereto, Defendant NORA KYLE ("KYLE") was an employee of Defendant MAXIMUS.

16. At all times material hereto, Defendant KYLE was Plaintiff's supervisor and had the power to hire, fire, demote, promote, and/or directly affect the terms and conditions of Plaintiff's employment, as well as the power to direct Plaintiff's daily work activities.

17. At all times material hereto, Defendant KYLE was Plaintiff's employer under the NYLL.

18. Defendant NIELSEN and Defendant KYLE are collectively referred to herein as "Individual Defendants."

19. Individual Defendants and Defendant MAXIMUS are collectively referred to herein as "Defendants."

## Material Facts

20. Plaintiff suffers from type 2 diabetes. Plaintiff also suffers from polyuria, meaning her body produces an abnormally large amount of urine. As such, she must urinate more frequently than is normal. At times, Plaintiff cannot hold her urine for longer than 40-60 minutes. Plaintiff's type 2 diabetes contributes to her polyuria.

21. Plaintiff's type 2 diabetes is an impairment that substantially limits one or more of Plaintiff's major life activities within the meaning of 42 U.S.C. § 12102(1)(A)—namely, regulating blood sugar.

22. Plaintiff's type 2 diabetes is a physical, mental or medical impairment preventing the exercise of a normal bodily function within the meaning of NYSHRL § 292(21) —namely, regulating blood sugar.

23. Plaintiff's polyuria is an impairment that substantially limits one or more of Plaintiff's major life activities within the meaning of 42 U.S.C. § 12102(1)(A)— namely, holding urine for more than 40-60 minutes.

24. Plaintiff's polyuria is a physical, mental or medical impairment preventing the exercise of a normal bodily function within the meaning of NYSHRL § 292(21)—namely, holding urine for more than 40-60 minutes.

25. On or about August 1, 2016, Plaintiff began working for Defendants at their call center located at 905 Elmgrove Road, Rochester, New York (the "Call Center").

26. Plaintiff earned a base wage of approximately $14.72 per hour and approximately $30,617.60 annually as a "Customer Service Specialist III." Plaintiff and other "Representatives" would field customer telephone calls regarding the New York State of Health (the "Marketplace").

27. The Marketplace is New York State's health insurance marketplace. It was created in accordance with the Patient Protection and Affordable Care Act of 2010.

28. Initially, Plaintiff's workday started at 9am, and Denise Benedict was her supervisor.

29. Defendants only permitted Plaintiff to take 3 breaks per day: a 15-minute break at or around 10am, a 30-minute lunch break at or around 1pm, and another 15-minute break at or around 3:30pm.

30. Outside these scheduled breaktimes, Plaintiff was forbidden from leaving her station—even if she needed to use the bathroom.

31. Defendants vigilantly monitored the Representatives' time. For example, Defendants measured each Representative's availability for customer calls using a metric called an "Adherence Score."

32. An Adherence Score represents the percentage of scheduled non-break time during which the Representative was either on a customer call or was available to receive one (on the "Queue").

33. Whenever a Representative strayed from their desk outside their scheduled break time, they would log off of the Queue, negatively impacting their Adherence Score.

34. Defendant MAXIMUS deployed a special unit ("Workforce") to enforce workplace discipline, including break-time compliance.

35. Equipped with walkie-talkies, Workforce employees ("Workforce Agents") patrolled the Call Center. When a Representative exceeded their allotted break time, a Workforce Agent would alert supervisors by walkie-talkie, identifying the Representative by their cubicle's number. Representatives, including Plaintiff, could frequently hear these announcements.

36. Plaintiff suffered from polyuria in or around March 2017.

37. In or around April or May 2017—after endeavoring to restrict her bathroom breaks to Defendants' limitations despite her polyuria—Plaintiff urinated herself. Plaintiff was utterly ashamed.

38. In around April or May 2017 Plaintiff informed Ms. Benedict that she suffered from polyuria and that she was experiencing severe bladder discomfort due to holding her urine until the Defendant MAXIMUS-scheduled bathroom breaks. Ms. Benedict supportively suggested that Plaintiff bring in a doctor's note indicating that Plaintiff needed more frequent bathroom breaks.

39. Ms. Benedict also granted Plaintiff a reasonable accommodation: when Plaintiff took an unplanned bathroom break, she requested a "Mod" for her time off of the Queue. Ms. Benedict approved Plaintiff's Mods, and as such Defendant MAXIMUS would not penalize Plaintiff by reducing her Adherence Score for her time out of the Queue.

40. About 1 week later, Plaintiff provided a doctor's note (the "Doctor's Note") to Ms. Benedict. Ms. Benedict said "I'll deal with this" and that she would deliver the Doctor's Note to the Workforce Agents.

41. When Plaintiff went to the bathroom outside of her assigned breaks, she did so under Workforce's watchful eye—Defendant KYLE (or at times another member of Workforce) would shepherd Plaintiff from her cubicle to the restroom. The Workforce Agent would then surreptitiously await Plaintiff's return outside the restroom, and escort Plaintiff to her cubicle. This happened in an extremely public workplace.

42. The Representatives worked in cubicles in one large room. Upon information and belief, there were approximately between 300 and 400 Representatives on the floor. Plaintiff was ashamed and outraged each time Workforce Agents shadowed her to the bathroom.

43. Defendants also intently monitored Representatives' attendance. When hired, Representatives were assigned 40 points to their "Point Balance" and were granted approximately 5 days for paid time off per year. Each time a Representative called out of work beyond these 5 days, Defendant MAXIMUS deducted 4 points from their Point Balance—even if they provided a doctor's note. Defendant MAXIMUS would also deduct from a Representative's Point Balance if their Adherence Score fell below a certain threshold.

44. On or around June 1, 2017, Defendants adjusted Plaintiff's schedule, and she began starting her workday at 8am. In addition, Defendant NIELSEN became Plaintiff's direct supervisor.

45. In or around early June 2017 Plaintiff took an unscheduled bathroom break. When she returned from the break, Defendant NIELSEN savagely berated her as approximately 5 other colleagues and/or supervisors stood around his desk. He yelled at Plaintiff, "LARTHA,

6

WHAT ARE YOU DOING!?" Mortified, Plaintiff began shaking. She explained that she had simply gone to the bathroom, and asked Defendant NIELSEN why he was yelling at her. Plaintiff also told Defendant NIELSEN that she could not hold her urine for as long as is normal.

46. Despite this, Defendant NIELSEN continued yelling at Plaintiff, insisting "THIS HAS GOTTA STOP!"

47. Defendant NIELSEN cruelly admonished Plaintiff for something she could not control and for which Ms. Benedict had previously provided a reasonable—and eminently simple—accommodation.

48. Approximately 1 week later, Plaintiff complained in person to Manager Anthony Carrol and Sharice (last name unknown) from human resources ("HR").

49. Plaintiff tearfully told Mr. Carrol and Sharice about her polyuria, that she had urinated herself attempting to comply with Defendants' harsh break schedule, and that Defendant NIELSEN had publicly yelled at her for using the bathroom.

50. Plaintiff also complained that Defendant NIELSEN refused her request for a reasonable accommodation—even though Ms. Benedict proved Defendants could easily provide it—and reiterated her request for a reasonable accommodation.

51. Although Sharice heard Plaintiff's complaint and was apologetic, Mr. Carrol was more engaged with his cellphone than with Plaintiff's complaints of discrimination and request for a reasonable accommodation. Sharice then told Plaintiff she would relay Plaintiff's request for a reasonable accommodation to the Workforce Agents.

52. In response, on or about June 7, 2017, Defendant NIELSEN retaliated against Plaintiff for complaining about his discriminatory conduct. He gave Plaintiff a "Documented Verbal Counseling" that pointed to 2 alleged infractions on Plaintiff's part.

53. First, Defendant NIELSEN alleged that, "On 6/6/17 instances concerning behavior were exhibited. You were observed using the internet regarding personal needs."

54. Upon information and belief, the other Representatives regularly used the internet for personal needs without incident.

55. The aforementioned writeup from June 7, 2017 was issued less than just 1 week after Plaintiff complained of discrimination.

56. Defendant NIELSEN also wrote on the writeup issued June 7, 2017, "It should be noted that a Verbal Counselling was provided on 6/2/17. This was determined to be a direct violation of the Code of Conduct which can be found in your employee handbook." The writeup did not specify what specific violation had been committed. Plaintiff was not in fact given a verbal warning as stated in the writeup.

57. This Documented Verbal Counseling was the beginning of a retaliatory and discriminatory campaign that Defendant NIELSEN waged against Plaintiff.

58. For example, unlike Ms. Benedict, who would approve Plaintiff's Mods for bathroom breaks, Defendant NIELSEN refused to do so. Indeed, he even subtracted 20 points from Plaintiff's Point Balance based on events from before he was Plaintiff's Supervisor. Upon information and belief, these events consisted in large part of Mods Ms. Benedict approved for Plaintiff's bathroom breaks or time Plaintiff spent on bathroom breaks.

59. When Plaintiff asked him whether this was proper, Defendant NIELSEN insisted that he had the right to *retroactively* discipline Plaintiff for events that preceded his supervisory role

over Plaintiff. Defendant NIELSEN then used this as a pretext to write up Plaintiff 3 times based on her attendance on or about June 21, 2017; August 3, 2017; and December 4, 2017 respectively.

60. Meanwhile, Defendant MAXIMUS refused to provide Plaintiff with additional bathroom breaks or approve Plaintiff's Mods thereby denying her need for a reasonable accommodation.

61. A few weeks after her meeting with Mr. Carrol and Sharice, Plaintiff began wearing adult diapers to work every day because she feared she would be terminated if she went to the bathroom as needed.

62. As a result of wearing adult diapers every day, Plaintiff developed a series of yeast infections for which she sought medical treatment. Sadly, this was preferable to Plaintiff over the prospect of either urinating herself or being terminated for taking necessary bathroom breaks.

63. At long last, in or around late October or November of 2017, Defendants vouchsafed Plaintiff more scheduled breaks. This was approximately 4 months after Defendants took away the reasonable accommodation that Ms. Benedict had so sensibly provided. Plaintiff continued to take lunch at 1pm, but now she had scheduled breaks at 9:30am, 11 am, 2:15pm and 3:30pm.

64. Finally afforded a reasonable accommodation—albeit 4 months after she requested one from Mr. Carrol and Sharice—Plaintiff stopped wearing diapers to work.

65. Plaintiff's yeast infections remitted shortly thereafter.

66. Nonetheless, Defendants continued to inflict indignities on Plaintiff by still dispatching Workforce Agents to observe Plaintiff's trips to and from the restroom. Plaintiff remained outraged and mortified by this daily dehumanization.

67. Meanwhile, Defendant NIELSEN continued his discriminatory and retaliatory campaign, writing up Plaintiff for arbitrary reasons.

68. On or about September 7, 2018, things came to a head when Defendants terminated Plaintiff.

69. Plaintiff applied for unemployment insurance, but Defendants disputed her eligibility. Defendants claimed they fired Plaintiff because she "failed to properly authenticate" a caller, listing the day of the final incident as June 18, 2018. This is plainly pretextual as Defendant NIELSEN's discriminatory and retaliatory campaign had been ongoing for several months preceding the alleged incident. Further, Defendants regularly recognized and rewarded Plaintiff for the way she handled customer calls.

70. On or about October 25, 2018, Defendants did not attend Plaintiff's hearing for unemployment insurance eligibility, and the New York State Department of Labor found for Claimant.

71. Defendants knew or should have known of the discriminatory and retaliatory conduct and failed to take corrective measures within their control.

72. Plaintiff was repulsed, offended, disturbed, humiliated, and disgusted by this blatantly unlawful and retaliatory termination.

73. Defendants retaliated against Plaintiff because Plaintiff objected to Defendants' discriminatory and unlawful conduct.

74. Defendants created a hostile work environment which unreasonably interfered with Plaintiff's ability to perform her job.

75. The above are just some of the ways Defendants regularly and continually harassed, discriminated against, and retaliated against Plaintiff while employing Plaintiff.

76. Defendants treated Plaintiff this way solely due to Plaintiff's disabilities (polyuria and type 2 diabetes).

77. Defendants acted intentionally and intended to harm Plaintiff.

78. Defendants unlawfully discriminated against, retaliated against, humiliated, degraded, and belittled Plaintiff. As a result, Plaintiff suffers loss of rights, emotional distress, and loss of income.

79. Plaintiff's performance was, upon information and belief, above average and satisfactory while working for Defendants.

80. As a result of the acts and conduct complained of herein, Plaintiff has suffered a loss of employment, income, the loss of a salary, loss of bonus, loss of benefits, other compensation which such employment entails, special damages, and great inconvenience.

81. Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

82. Defendants acted maliciously, willfully, outrageously, and with full knowledge of the law.

83. As such, Plaintiff demands punitive damages as against all Defendants, jointly and severally.

**First Cause of Action for Discrimination**
**Under the ADA**
**(Not Against Individual Defendants)**

84. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

85. The ADA, at 42 U.S.C. §12112, provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the

hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

86. Defendant MAXIMUS violated the section cited herein as set forth.

### Second Cause of Action for Retaliation
### Under the ADA
### (Not Against Individual Defendants)

87. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

88. The ADA, at 42 U.S.C. §12203, provides:

> (a)Retaliation
>
> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.
>
> (b)Interference, coercion, or intimidation
>
> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

89. Defendant MAXIMUS violated the section cited herein as set forth.

### Third Cause of Action for Discrimination
### Under the New York State Executive Law
### (Against all Defendants)

90. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

91. New York State Executive Law § 296(1) provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex,

       disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

92. Defendants violated the section cited herein as set forth.

**Fourth Cause of Action for Discrimination
Under the New York State Executive Law
(Not Against Defendant MAXIMUS)**

93. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

94. New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

95. Individual Defendants violated the section cited herein as set forth.

**Fifth Cause of Action for Retaliation
Under the New York State Executive Law
*(*Against all Defendants)**

96. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

97. New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

98. Defendants violated the section cited herein as set forth.

**<u>Jury Demand</u>**

99. Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by the ADA and the NYSHRL in that Defendants discriminated against Plaintiff based on Plaintiff's disability and wrongfully terminated Plaintiff due to Plaintiff's disability and retaliated against Plaintiff for engaging in protected activity;

B. Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and conduct and to otherwise make Plaintiff whole for any losses suffered because of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental and emotional injury, distress, pain, suffering, and injury to Plaintiff's reputation in an amount to be proven;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
October 31, 2019

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By: _____
Steven Fingerhut
*Attorneys for Plaintiff*
45 Broadway, Suite 620
New York, New York 10006
(212) 248-7431
sfingerhut@tpglaws.com